Peelle, Ch. J.,
delivered the opinion of the court:
The court is asked to construe its decree herein respecting the right and authority of the Secretary of the Interior or of the Treasury Department to apply any part of the money appropriated to pay said decree to the payment of fees to the attorneys of the Cherokee Nation after the Supreme Court had affirmed the decree in the name of the Cherokee Nation, though directing that the money arising thereunder be paid to the Eastern Cherokees.
By section 68 of the act of July 1, 1902 (32 Stat. L., 726), jurisdiction was conferred on the Court of Claims to consider and adjudge “ any claim which the Cherokee tribe, or any band thereof, arising under treaty stipulations, may have against the United States, upon which suit shall be instituted within two years after the approval of this act; * * * through attorneys employed and to be compensated in the manner prescribed in sections twenty-one hundred and three to twenty-one hundred and six, both inclusive, of the Revised Statutes of the United States.”
Under that act a contract was entered into January 16, 1903 — before the passage of the second jurisdictional act hereafter referred to — between the Cherokee Nation, through its principal chief, and Finkelnburg, Nagel & Kirby and Edgar Smith in accordance with the sections of the Revised Statutes referred to in said jurisdictional act, which contract was, as required by said sections, approved by the Secretary of the Interior.
The purpose of the contract, as therein expressed, was to secure the services of the attorneys “ in the prosecution of the claim of the Cherokee Nation against the United States, which claim is commonly known as-the ‘Slade-Bender’ award, and grew out of and described in the agreement be *125 tween the Cherokee Nation and the United States for the purchase of what is known as the Cherokee Outlet.” No mention is made therein of any other claim; nor was the contract made contingent upon the nation receiving the benefit of the amount recovered. The validity of said contract and the authority of said attorneys to represent the Cherokee Nation thereunder was not, and is not, controverted.
The attorneys so employed brought suit in the name of the Cherokee Nation v. The United States (No. 23199), within the time prescribed in the jurisdictional act; but the Eastern Cherokees — that is to say, those who had sold their lands in North Carolina under the treaty of 1835-36 and who had been forced to remove to the Indian Territory (the expense of whose removal was involved in the suit) and certain other Eastern Cherokees who had refused or evaded removal or who had emigrated elsewhere (and are, therefore, contra-distinguished from the Cherokees called “Old Settlers,” who were removed West prior to said treaty) — were dissatisfied with the suit in the name of the Cherokee Nation, which explains the purpose of the act of March 3, 1903 (32 Stat. L., 996), whereby the jurisdictional section was construed to give “the Eastern Cherokees, so called, including those in the Cherokee Nation and those who remained east of the Mississippi River, acting together or as two bodies, as they may be advised, the status of a band or bands, as the case may be, for all the purposes of said section: Provided, That the prosecution of such suit on the part of the Eastern Cherokees shall be through attorneys employed by their proper authorities, their compensation for expenses and services rendered in relation to such claim to be fixed by the Court of Claims upon the termination of such suit.”
The act further provided that said section 68 should be so construed “ as to require that both the Cherokee Nation and said Eastern Cherokees, so called, shall be made parties to any suit which may be instituted against the United States under said section.”
Following this act petitions were filed on behalf of the Eastern Cherokees, No. 23214, and the Eastern and Emigrant Cherokees, No. 23212, all which cases were subsequently con- *126 solidatecl and tried as one case. In the cases so consolidated the court filed elaborate findings of fact, with conclusions of law thereon, which are set forth in 40 Court of Claims Reports, 252, and by reference made a part hereof.
Thereafter, on May 18, 1905, the court entered its decree herein as set forth in Finding III.
Therein it was, among other things, provided that “so much of any of the above-mentioned items or amounts as the Cherokee Nation shall have contracted to pay as counsel fees under and in accordance with the provisions of sections 2103 and 2106, both inclusive, of the Revised Statutes of the United States, and so much of the amount shown in item No. 2 as this court hereafter by appropriate order or decree' shall allow for counsel fees and expenses under the provisions of the act of March 3, 1903, above referred to, shall be paid by the Secretary of the Treasury to the persons entitled to receive the same upon the making of an appropriation by Congress to pay this judgment. The allowance of fees and expenses by this court under said act of March 3, 1903, is reserved until the coming in of the mandate of the Supreme Court of the United States.”
From the decree thus rendered the United States appealed, as did the Cherokee Nation and the Eastern Cherokees. United States v. Cherokee Nation (102 U. S., 101-130). On behalf of the Eastern Cherokees errors were assigned, among others, as follows: “The court erred in charging the said fund of $1,111,284 and interest, to be realized from its said judgment or decree, with the fees of the attorneys for the Cherokee Nation.”
In support of the error thus assigned, counsel for the Eastern Cherokees, among other things, contended that said amount was a trust fund held by the Government for the exclusive use and benefit of the Eastern Cherokees, and that the attorneys representing the Cherokee Nation should not be paid therefrom; that the Eastern Cherokees being rightfully in court and having established their right to said fund, it should not be chargeable with attorneys’ fees to the Cherokee Nation. In response to that contention the Cherokee Nation, through its counsel, insisted that in the prosecution *127 of the action it was representing all of its members, which included the Eastern Cherokees as component members of the nation; that the right asserted by the Eastern Cherokees was based on the act of March 3, 1903, to which neither the nation nor its citizens did consent.
The Supreme Court, in affirming the decree in the name of the Cherokee Nation, as well as disposing of the issue thus raised, said:
“We concur wdth the Court of Claims in the wisdom of rendering judgment in favor of the Cherokee Nation, subject to the limitation that the amount thereof should be paid to the Secretary of the Interior to be distributed directly to the parties entitled to it, but we think that the terms of the second subdivision of the fourth paragraph of the decree, in directing that the distribution be made to ‘the Eastern and Western Cherokees,’ are perhaps liable to misconstruction, although limited to those ‘who were parties either to the treaty of New Echota as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi River.’ This should be modified so as to direct the distribution to be made to the Eastern Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835-36 and 1846, and exclusive of the Old Settlers.
“ In view of the language of the jurisdictional acts of 1902 and 1903 in respect to the Cherokee Nation, we are not disposed to interfere with the Court of Claims in the allowance of fees and costs.”
And after referring to the several acts discontinuing the tribal government of the Cherokee Nation and the subsequent joint resolution continuing the tribal government “for all' purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed,” the court said:
“ Nevertheless, taking the entire record together, the various treaties, and acts of Congress, and of the Cherokee council, and the language of the jurisdictional acts of 1902 and 1903, we leave the decree as it is in respect to counsel fees and costs.”
In concluding the opinion the court said:
“The result is that with the modification of the second subdivision of the fourth paragraph of the decree, relating to the $1,111,284.70 with interest,, above indicated, the decree of the Court of Claims is affirmed.”
*128 It must not be overlooked that the jurisdictional acts under which these cases were brought were founded upon the agreement between the United States and the Cherokee Nation of December 19,1891, for the sale of the Cherokee Outlet, which agreement was approved by the Cherokee council January 4, 1892, and ratified by Congress March 3, 1893 (27 Stat. L., 640, sec. 10).
That part of the agreement material to the present issue is as follows:
“The United States shall, without delay, render to the Cherokee Nation, through any agent appointed by authority of the national council, a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817, 1819, 1825, 1828, 1835-36, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect; and upon such accounting, should the Cherokee Nation, by its national council, conclude and determine that such accounting is incorrect or unjust, then the Cherokee Nation shall have the right within twelve months to enter suit against the United States in the Court of Claims, with the right of appeal to the Supreme Court of the United States by either party, for any alleged or declared amount of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or laws, which may be claimed to be omitted from, or improperly or unjustly or illegally adjusted in said accounting; and the Congress of the United States shall, at its next session, after such case shall be finally decided and certified to Congress according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation, should judgment be rendered in her favor; or, if it shall be found upon such accounting that any sum of money has been so withheld, the amount shall be duly appropriated by Congress, payable to the Cherokee Nation, upon the order of its national council, such appropriation to be made by Congress, if then in session, and if not, then at the session immediately following such accounting.”
It will thus be noted that the Cherokee Nation, by the terms of that agreement, was acting for all the Cherokees entitled to share in any fund which might be due under any of the treaties there named, including the treaties of 1835-36 and 1846. The agreement was not limited to any fund which might be found due for removal of the Eastern Cherokees to *129 the Indian Territory; but the accounting was to embrace “ a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years ” there named, “ and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect.”
Notwithstanding this agreement, the contract with the attorneys for the Cherokee Nation was confined to the claim for the removal expenses of the Eastern Cherokees, known, as recited in the contract, as the “ Slade-Bender ” award.
The first jurisdictional act (section 68, July 1, 1902, 32 Stat. L., 126) gave “ the Cherokee tribe, or any band thereof,” the right to maintain an action to determine what claim, if any, arising under treaty stipulations, said tribe or band thereof may have against the United States. The court was further given “ authority, by proper orders and process, to make parties to any such suit all persons whose presence in the litigation it may deem necessary or proper to the final determination of the matter in controversy.”
The act was perhaps sufficiently broad and definite for the court to have determined the controversy between all the parties, but as there were no bands in the Cherokee tribe or nation, some doubt arose in the minds of those representing the Eastern Cherokees as to how or whether they could be made separate parties under that act, and so to put the matter at rest the jurisdictional section was by the act of March 3, 1903 (32 Stat. L., 996), so construed as to give the Eastern Cherokees, including those -in the Cherokee Nation, as well as those east of the Mississippi Elver acting together or as two bodies, the status of a band with the right to prosecute such suit through their attorneys. But it was not the purpose of the act to supercede the action commenced by the Cherokee Nation. On the contrary, the later act in express terms further provided that the first act should be “ so construed as to require that both the Cherokee Nation and said Eastern Cherokees, so called, shall be made parties to any suit which may be instituted against the United States under said section.”
The court was also given authority “to render a judgment in favor of the rightful claimant and also to determine as *130 between the different claimants, to whom the judgment so rendered equitably belongs either wholly or in part.” The court was also “ required to determine whether, for the purpose of participating in said claim, the Cherokee Indians who remained east of the Mississippi River constitute a part of the Cherokee Nation, or of the Eastern Cherokees, so called, as the case may be.”
From the foregoing agreement and jurisdictional acts it is apparent that the Cherokee Nation was authorized and required to prosecute the action it did; and having obtained judgment in its name in the Court of Claims, which, on appeal, was affirmed, shall it be denied the right of compensation to its attorneys out of the fund in controversy because the money so recovered was directed by the Supreme Court to be paid to 'the Secretary of the Interior for distribution “to the Eastern Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835-36 and 1846, and exclusive of the Old Settlers ? ”
The litigation was over a fund arising from treaty stipulations supposed to be in the Treasury in trust for the parties entitled thereto. Surely the fund which was the stake in controversy should bear the expense, and such was the conclusion of this court. And in respect to attorneys’ fees the Supreme Court ruled that, “ taking the entire record together the various treaties, and acts of Congress, and of the Cherokee councils,' and the language of the jurisdictional acts of 1902 and 1903, we leave the decree as it is in respect to counsel fees and costs.”
The court, in view of the whole record and the jurisdictional acts of 1902 and 1903, having left the “ decree as it is in respect, to counsel fees and costs,” no further action Avas contemplated by or required of the court in respect to attorneys’ fees under the act of 1902.
The decree clearly recognized the distinction between the fees authorized by the separate acts. That is to say, the fees to be paid to the attorneys for the Cherokee Nation under the first act Avere to be governed by the contract made in accordance therewith, while under the second act the court was authorized to fix the fees of the attorneys for the Eastern *131 Cherokees, which it did at 15 per cent of the amount recovered, as they had agreed, to be apportioned among the many attorneys employed for many years in their behalf.
To prevent any portion of the money due the Eastern Cherokees being applied to the payment of fees and expenses of the attorneys of the Cherokee Nation, the Eastern Cherokees, through their attorneys, commenced an injunction proceeding in the courts of the District of Columbia; but they were denied any relief, and their petition was dismissed, from which no appeal was prosecuted; and thereafter the Secretary of the Treasury, on the certification of the Secretary of the Interior and the advice of the Assistant Solicitor of .the Treasury, paid to the attorneys of the Cherokee Nation, in pursuance of their contract, as directed by the decree, the fees due thereunder.
It was not until after the payment of the money under said contract that the Eastern Cherokees filed their supplemental petition herein praying the court to so construe its decree as to provide that the sum of $1,111,284.10 should not be chargeable with the fees of the attorneys of the Cherokee Nation. But independent of their delay, such construction would not only be contrary to the language of the decree, but would, in effect, be changing the decree after its affirmance by the Supreme Court, and, too, after the con-., tention here was presented there and denied. (Ex parte Union Steamboat Co. (178 U. S., 317, 318); Gaines v. Rugg (148 U. S., 228, 237) and the numerous authorities therein cited; In re Sanford Fork and Tool Co. (160 U. S., 247, 255); In re Potts, petitioner (166 U. S., 263, 265), the sub-' stance of all which is that whatever was before the court and disposed of is considered as finally settled, and the inferior court is bound by the decree as the law of the case, and can not vary or examine it other than for the purpose of exe- ■ cution.
The Cherokee Nation was the proper party to the suit under both jurisdictional acts, and it had contracted to pay its attorneys, with the approval of the Secretary of the Interior, in strict accordance with the law, all of which was recognized by the court and sanctioned and provided for in *132 its decree; and the decree, in respect to the payment of said fees, having been affirmed and executed, the court is not at liberty to modify the decree or to construe it contrary to the clear import of the language used, and therefore the prayer of the petitioners is denied.'
For the reasons we have given the supplemental petition must be dismissed, which is accordingly done.