Booth, Judge,
delivered the opinion of the court:
This is a suit for a large amount asserted as due the plaintiff for services rendered the defendant Indians as an attorney. The plaintiff was formerly a member of the law firm of Mansfield, McMurray & Cornish, of South McAlester, Oklahoma. On May 5,1909, this firm was dissolved. During the existence of the firm it had almost continuously been engaged in representing the Choctaw and Chickasaw Indians, and claimed to have at the date of dissolution a number of outstanding and unpaid fees due from either one or both of said Indian tribes. On May 5, 1909, the date of dissolution, Messrs. Mansfield and Cornish assigned in writing all of said outstanding demands to the plaintiff, and by that instrument vested in him the ownership and right to collect the same. The plaintiff thereafter made an effort to settle with the Secretary of the Interior respecting the claims of the partnership, but it failed of consummation. He then went to Congress, where on May 25, 1918, by section 18 of the Indian appropriation act (40 Stat. 561), he secured the enactment of the special jurisdictional act set out in Finding IV. The act is lengthy and somewhat involved. It does, however, confer on the court jurisdiction to consider and adjudicate three claims for which the plaintiff was contending, viz, for services rendered in the case of the Choctaw and Chickasaw Indians v. United States and Chichasaw Freedmen; for expenses incurred under sections 31, 32, and 33 of the act of July 1, 1902, the act which created the citizenship court and authorized the retrial of what is known as “ court claimant ” cases, and lastly for the payment of two unpaid Chickasaw warrants. With reference to the last item, the two unpaid warrants, the record shows that after the institution of this suit they were paid to the plaintiff, and hence are no longer in issue.
The plaintiff filed his first petition in this court September 23, 1918. This petition followed the jurisdictional act *494 and contained only allegations respecting the three claims mentioned. The total demand then made was $63,633.07, exclusive of interest on the amounts, made up in items as follows: Services rendered in the Free&men case, $27,500; expenses incurred ,in prosecuting the Freecknen case, $25,544.07, and the two unpaid warrants $10,589. The special jurisdictional act gave express authority to the defendant Indians to interpose all proper defenses by way of counterclaims or set-offs, either against the assignors or assignee. All statutes of limitations against the same were waived, and provision was made for the representation of the defendants by their own counsel in conjunction with the Attorney General. The defendant Indians filed a counterclaim in which the allegation is made that instead of an existing indebtedness of the Indians to the plaintiff, the plaintiff is indebted to the defendants in the sum of $216,348.30, exclusive of interest thereon. The items which make up the counterclaim consist largely of warrants for the payment of money to the plaintiff’s law firm which the defendant Indians allege were illegally issued and paid, because the laws governing the issuance and payment thereof were not observed, and a contract for professional services upon which money was paid did not comply with section 2103 of the Revised Statutes. With the pleadings in this court in this status the plaintiff deemed it essential to again go to Congress, obviously believing that under the terms and conditions of the original jurisdictional act he was precluded from asserting claims other than those authorized in the act, and placed at an extreme disadvantage in meeting the defendants’ counterclaim. Congress recognized the situation of the parties, and on July 19, 1919, 41 Stat. 163, 234, amended the act of May 25, 1918, by enlarging the jurisdiction of the court so as to embrace such additional claims as would in their nature meet the set-off and counterclaim of the defendants. Following the passage of the amendatory act the plaintiff, on September 25, 1919, filed a supplemental petition wherein he increased his demands against the defendants to the extent of $312,500, embracing within this petition claims for professional services in a *495 number of contentions as to Indian rights and funds, as well as litigated cases, thereby bringing his total claims to the substantial sum of $376,133.07, exclusive of interest. Finally, on February 2, 1923, the plaintiff by leave of court, filed his last amended petition, by the allegations of which he contends in eight separate counts for a judgment for the sum of $315,544.07 and interest thereon.
We have set forth these facts in tedious detail. Their recitation discloses the wide and acute disputation between the parties, a contest so vigorous that the record in this case is of immense proportions and required an extended time in preparation.
The most perplexing question, the one which engenders the gravest doubt, and extremely vital in its consequences, is the one as to whether the court, in arriving at its conclusions as to sums due pro and con, is authorized under the jurisdictional acts to exercise its judgment independently of section 2103, Eevised Statutes, and the other special acts of Congress regulating and prescribing the exelusive method of dealing and contracting with tribal Indians. Section 2103, Eevised Statutes, is a most stringent and protective enactment. The section points out in precise terms the method of contracting with Indian tribes and individual Indians not citizens of the United States. If this method is not followed, any proceeding contrary thereto is absolutely void. Any money paid upon contracts not executed according to its terms and approved by the Secretary of the Interior and Commissioner of Indian Affairs may be recovered back by the Indians. With the possible exception of two of the plaintiff’s claims, no written contracts •of employment conforming to section 2103, Eevised Statutes, and existing special laws, obtain. All the items of defendants’ counterclaim are predicated upon a right to recover the same because of funds paid without compliance with the law. So that if Congress intended to restrict the court to observance of Indian laws relating to dealings with ■ the Indians the case would be freed of the many difficulties it otherwise presents.
The plaintiff of course contends that the jurisdictional . acts send the case to this court with jurisdiction granted to *496 consider and adjudicate the same upon the basis of service rendered and results accomplished, and render judgment for what they were reasonably worth. The defendants, on the other hand, challenge the contention and insist upon the elimination of all claims for service where the record fails to establish a contract made in accord with section 2103, Revised Statutes, or other special laws.
The court in arriving at a conclusion is relegated to an application of the usual rules of statutory construction. What was the legislative intent? Taking the transaction as it took shape before Congress and the Interior Department before the acts were passed, it is manifest that the plaintiff was seeking to collect what he believed he was entitled to receive, but without the right to assert his claims in a court. The controversy between him and the defendant Indians was an old and prolonged one, the Indians disavowing any indebtedness at all, and refusing until this suit was brought to pay a single one of his many claims. The Secretary of the Interior declined to intervene and attempt an adjustment of the differences. Congress with plenary authority over Indian tribal lands and funds, with full knowledge of the status of affairs, sends the controversy to this court to adjudicate upon the basis of “ such amount or amounts as may be found to be due thereon.” The Indians may defend, notwithstanding any statutes of limitations. Whatever may be due from the plaintiff to the defendants upon coal-mining leases is to be ascertained upon a “ fair and equitable basis.” Additional claims are authorized under the amendatory act “ to the end,” the act recites, “ that a complete and final adjustment may be had between said parties as to outstanding matters of controversy or account between them.” Such expressions we believe are susceptible to a construction that Congress intended a reference of the case to this court in all its aspects, and from the record render such a judgment as a complete settlement of the disputation warrants upon the basis of service rendered and results accomplished, service which the Indians accepted, and, if beneficial, for which they should pay, taking into account, of course, what the Indians have paid and the circumstances *497 under which payments were made. This position we feel is fortified by the fact that many of the items in the defendants’ counterclaim were paid more than twenty-five years ago, the very latest ones twenty-two years ago. The statute of limitations with respect to them is waived, and the plaintiff given the correlative right to interpose such additional claims as may offset them. This we think is sufficient evidence of a Congressional intention to warrant the conclusion that the interposition of mere technical defenses and assertion was not available to either party. If it were otherwise there would have been no necessity for special legislation conferring jurisdictioin on the court to hear the case. Assuredly Congress did not intend to place the defendants in a more favorable position as to the controversy than the plaintiff, especially so when fully cognizant of the exact situation. What we are to adjudicate are of course legal and not moral claims. This position is expressly fortified by the proviso to the jurisdictional act wherein authority is conferred upon the Secretary of the' Interior to act as arbitrator, and compose, if possible, the existing differences of account. A distinct recognition of the apparent fact that the state of the controversy, old and complicated as it was, involved as the jurisdictional acts attest a final adjustment of all claims and demands predicated upon actual and beneficial service rendered and furnished for the defendant Indians. We have heretofore had cases of a similar nature. Ute Indians, 46 C. Cls. 225; Eastern Cherokees, 45 C. Cls. 104; Ottawa and Chippewa Indians, 42 C. Cls. 518; Butler & Vale case, 43 C. Cls. 497; Winton v. Amos, 51 C. Cls. 284; Sisseton and Wahpeton Indians, 58 C. Cls. 302.

The Ghichasaw Freedmen Case

Subsequent to the adoption of the policy of alloting certain Indian tribal lands in severalty to the members of the tribes, the matter of a proper and legitimate enrollment of those entitled to participate therein became acute. Among others to claim the right of enrollment were the Chickasaw freedmen, a considerable number of the descendants of former slaves of the Indians. On April 23, 1866, the Choc *498 taw and Chickasaw tribes agreed by treaty to discontinue slavery. The freedmen so classed contended for enrollment and the right of allotment. The Indians vigorously contested the same. Congress on July 1,1902, 32 Stat. 641, 646-648, by enacting what is commonly designated as the supplemental treaty, proposed to the Indians a method of settlement wherein it was provided that the freedmen should receive allotments as members of the tribes. In the same proposed law the Attorney General of the United States is directed to file in this court a bill of interpleader against the defendant nations and the freedmen, and jurisdiction is conferred upon the court to adjudicate and determine the controversy. If the court sustains the right of the freedmen manifestly they were to continue in possession of their allotments without recompense to the Indians. If a contrary decision is reached, then the lands allotted to the freedmen were to be appraised by the Dawes Commission and the amount of their value to be paid the Indians by an-appropriation from Federal funds. The act provided a referendum and the same was ratified by the Indians September 25, 1902. Among other provisions the act authorized the Indians to employ counsel in the manner prescribed' in sections 2103 to 2106, Revised Statutes. The Indians employed the firm of Mansfield, McMurray & Cornish. Contracts providing for a contingent fee equal to 6 per centum of the amount recovered in any judgment they might obtain were entered into by the parties. The Secretary of Interior and Commissioner of Indian Affairs limited the compensation of the attorneys to a contingent fee of $21,500 for all services in connection therewith. The attorneys accepted the limitation, and with the contracts so changed they were duly approved in the manner required by law. The firm made repeated efforts to collect the fee, and on each occasion was frustrated by the Secretary of the Interior and the Commissioner of Indian Affairs. The reason assigned for nonpayment was a disputation then existing between the Indians and the firm respecting certain alleged overpay-ments growing out of other and different transactions. The defendants concede a lack of legitimate defense to the allowance of the fee. The only possible controversy respecting *499 this item is as to the date from which interest, allowed under the jurisdictional act, should be computed. The plaintiff insists that interest on the fee should be computed from July 1, 1904, whereas the defendants contend that until the entry of final judgment by the Court of Claims, after the case had been affirmed by the Supreme Court and the appraisal completed by the commission and appropriation made for the amount of the same, there was no obligation to pay. The final sum, $606,936.08, was fixed by a decree of this court on January 24, 1910. Congress appropriated for the same on June 25, 1910, and it was finally placed to the credit of the Choctaw and Chickasaw nations in the Treasury of the United States on July 1, 1910. The fee was contingent upon recovery.
While it may appear somewhat technical, nevertheless it is manifest from the record that the Indians were not under the contracts liable for the fee until funds were available as a result of the service rendered. It is true that when the Supreme Court announced its opinion affirming the decision of this court, the., case of the Indians so far as controverted questions of law were involved terminated, but no funds as a result thereof were available. However, much remained to be done, the lands were to be appraised, and the value thereof appropriated for by Congress. Until this was accomplished, liability for the fee did not attach. As a matter of fact, the contract itself expressly provided for payment of the fee at the Treasury of the United States. The plaintiff seems to have acted upon this view of the matter, for the record discloses the absence of any effort upon his part to collect the fee until June 25, 1910.
We believe the findings of the court are correct, and the claim will be allowed for $27,500, with interest thereon at the rate of 6 per centum per annum from July 1, 1910.

Expenses Incident to “Court Claimant” Oases

On June 10, 1896, 29 Stat. 321, 339, Congress, with reference to the Five Civilized Tribes of Indians, inaugurated its policy of dissolving tribal government and allotting the Indian lands to the members of the tribes. This legislation *500 was- the advance step toward the end. By its terms the Dawes Commission was given authority to make up citizenship rolls, a task theretofore most generally performed by the Indians. The statute lodged the authority in a neutral tribunal, and from the decision of the commission an appeal was allowed to the United States courts in the Indian Territory. The property, both real and personal, of the Choctaw and Chickasaw Indians, was of immense value, and this fact attracted applicants for enrollment from nearly if not quite all individuals who could by any possibility trace through ancestral blood relationship to the tribes sufficient in extent to meet the requirements for enrollment. No single event has demonstrated more pronounced contentions or more vigorous contests than the making of Indian rolls for the purpose of allotments. Appeals were taken from the Dawes Commission involving the right of about 3,600 persons to enrollment. These are commonly known as “court claimants,” a designation we will adopt. When their appeals reached the United States courts they were tried de novo, and the record fails to show service upon the Indian tribes. As a result, there were at least 2,300 persons added to the rolls by the decisions of the United States courts. The Indians, solicitous to reduce their rolls to the minimum number, were not pleased with the decisions. It was asserted by them that much of the testimony brought before the courts was false and that gross fraud and deceit had obtained in practically all of the cases. The plaintiff, i. e., the law firm of Mansfield, McMurray & Cornish, seems to have been in accord with the prevailing Indian sentiment. On January 17, 1901, the firm entered into á written contract with the Choctaws and Chickasaws, by the terms of which the lawyers agreed to use their best efforts to prevent the enrollment of the “court claimants.” The fee was contingent upon success and to be nine (9) per centum of the value of tribal property saved to the nations. The Secretary of the Interior and the Commissioner of Indian Affairs, to whom this contract was presented for approval under section 2103 of Revised Statutes, declined to approve it upon the terms stated therein. Instead, these officials indicated *501 a willingness to approve a contract for five (5) per centum of the value of the lands saved and in no event the compensation to exceed $250,000. The law firm refused to assent to the proposed terms and the contract was of no force and effect. The plaintiff’s firm, ably assisted by the Interior Department, went to Congress and finally Congress, on July 1, 1902 (32 Stat. 641, 646), by sections 31, 32, and 33 of the act to confirm and ratify an agreement with the Choctaw and Chickasaw Indians, and for other purposes, created a special court, known as the Choctaw and Chickasaw Citizenship Court, and invested the same with plenary jurisdiction to review and readjudicate and finally determine the question of the right of the “court claimants” to enrollment. On March 3, 1903 (32 Stat. 982, 995), Congress granted to the Citizenship Court the additional juridiction to fix reasonable compensation to be paid the attorneys under their contract of January 17, 1901, irrespective of the amounts stated in the contract. The plaintiff’s firm represented the Indians in 263 suits involving the enrollment rights of about 3,403 claimants, resulting in an almost complete reversal of the decision of the United States courts for the territory, and excluding from the right of enrollment all the said “court claimants” except about 156. It is difficult to estimate with accuracy the value of the landed estate saved to the Indians by this litigation. It must be and is conceded that it ran into the millions.
The Citizenship Court was by the first act required to terminate its existence by December 31, 1903, the subsequent legislation heretofore cited extended the time until December 31, 1904. Section 33 of the act of July 1, 1902 (32 Stat. 649), provided as follows: “All expenses necessary to the proper conduct, on behalf of the nations, of the suits and proceedings provided for in this and the two preceding sections shall be incurred under the direction of the two nations, and the Secretary of the Interior is hereby authorized, upon certificate of said executives, to pay such expenses as in his judgment are reasonable and necessary out of any of the joint funds of said nations in the Treasury of the United States.” The Secretary of the Interior, upon whom the final *502 responsibility for payment of expenses rested under tbe law, promulgated on March 18, 1903, certain regulations with respect to the presentation, audit and allowance of the attorneys’ expense account. These regulations are set out in Finding XV. They are in nowise unusual and simply provide for the authentication of each item of expense in excess of $1 by return of a voucher disclosing in detail the expenditure. On January 26, 1903, the attorneys transmitted to the Secretary their expense accounts for the months of October, November, December, 1902, and January, February, March and April, 1903. The total amount was $3,540.64. The papers making up the submission were duly verified by the lawyers and had the approval of the chief executives of the two nations. The Commissioner of Indian Affairs approved the accounts, but the Secretary of the Interior overruled his approval and declined to allow the greater portion of the items claimed. Items covering expenses for clerks, stenographers, office furniture, stationery, typewriters and rent of typewriters were disapproved by the Secretary as not within the purview of the law. The remaining items of the submission were returned to the plaintiff without express disapproval, but with the admonition that they did not meet the requirements of the regulations as to proper authentication. The attorneys did not again present to the Secretary an itemized statement of expenses incurred until August 12,1909, notwithstanding the fact that on December 12,1905, the Secretary had requested in writing that they do so. On August 12, 1909, the submitted account covered all previous items and additional ones, increasing the demand to $25,-537.15. This submission met the fate of its predecessor. It was disapproved for the same reasons. On March 21, 1911, the Secretary again communicated with the attorneys and advised them as to his objections to the former submissions and pointed out expressly the class of expense he considered within the law. The plaintiff did not comply with the terms of this communication, did not submit additional evidence of accuracy, so finally, on August 23, 1911, following personal interviews at the department in Washington, the Secretary advised the plaintiff that if properly vouchered, $2,700 of *503 the amount claimed might meet Ms approval, but he would not in any event authorize the payment of even that amount in view of the claims of the defendant Indians against the plaintiff for the sum of $182,000.
We have reproduced the items of expense contended for by plaintiff in Finding XVII. The plaintiff, in view of this expense account, apparently assumes the attitude that all incidental expense growing out of the litigation was to be borne by the defendant Indians, and that all that was to be done by the lawyers was to analyze the testimony and try the cases. This position is untenable. The plaintiff hazarded a right of compensation under the contract upon success in the undertaking and manifestly the legitimate expenses under the law were to be paid by the defendants; but this obligation of the defendants in nowise extended to the point of saving the plaintiff from all character of expense. The plaintiff was familiar with Indian litigation and the course of proceeding in contested enrollment cases; he knew the burdens to be assumed by the contestants and the difficulties to be encountered in procuring proper evidence. The magnitude of the undertaking and the risk of loss which he assumed was entirely familiar to him and his associates. What the statute intended as a charge by way of expense was the expense indispensably necessary to set in motion the machinery of the court, such as proper court charges and the fees fixed by law. It would seemingly constitute a most unusual allowance to charge against the defendants the cost of usual and clearly to be anticipated expense of maintaining a law office, sufficient clerks to properly prepare and conduct the case, as well as all other overhead expense. The plaintiff knew of the necessity for all that was done, and as to most of the items claimed — they come within the compensation paid. Of the items claimed we believe but two are allowable, i. e., items one for $2,218.53, and two for $85.88.
The defendant Indians challenge the right of the court to allow the claimed expense account. The contention is predicated upon a lack of jurisdiction and a plea of res adjudicatei. It is true that the statute authorizing the expenditure pointed out the precise way of securing payment *504 of the sums claimed and invested the Secretary of the Interior with final jurisdiction as to allowance and payment. The tribunal thus erected and clothed with jurisdiction was obviously at the time exclusive. The jurisdictional acts, however, under which the case comes to this court alter materially the course of proceeding formerly prescribed and not only vary in important particulars the jurisdiction of the Secretary of the Interior with respect to the subject matter of contention, but clothe him with the optional authority to adjust “ by mutual agreement with the interested parties herein ” not only this item, but all others concerned. It was not until he declined to arbitrate that the case comes here. It would be a meaningless grant of jurisdiction to give authority to an officer to do certain things if the officer had by his previous treatment of the case foreclosed his power to act, for the defense now interposed was available before the Secretary. In addition, the Secretary of the Interior did not disapprove the expense accounts presented to him as to each item on its merits. The final reason for disapproval was the existence of a counterclaim upon the part of the Indians; the Secretary under the statute was not as to this proceeding clothed with jurisdiction to pass upon the merits of the counterclaim growing out of other and different transactions. The duty enjoined was to pass upon the plaintiff’s expense account and approve or disapprove it for reasons disclosed upon the face of the submission. There was no authority under the statute which empowered him to go outside the particular record and disapprove the accounts for extraneous reasons.
The Citizenship Court, in fixing plaintiff’s compensation in the “ court claimant ” cases arrived at the sum allowed by reference to the contract of January 17, 1901, and in the order of allowance provided that the same should be “in lieu of all expenses save and except such as are provided by law, as set out in section 33 of the act of July 1, 1902.” There would have been no occasion for an order of this character if all expenses incident to the prosecution of the litigation were to be charged against the defendants. Clearly it was in the mind of the court in fixing reasonable *505 compensation that some expense had been incurred by the plaintiff not allowable under the statute, otherwise the court would not have taken the special care to so particularize. The plaintiff accepted the fee fixed by the court without objection.

The J. Hale Sypher Case

Congress recognized by the act of March 3, 1891 (26 Stat. 989, 1025), a governmental obligation to pay the Choctaw Indians for what is commonly designated as the ■“ leased district.” We need not discuss the controversy in detail. It is sufficient for present purposes to say that $2,991,500 was duly appropriated for the intended purpose. Subsequent to the passage of the above act, and prior to the payment and disbursement of the funds appropriated, protest was made by leading governmental officials against the payment of the appropriation to the Indians. The Indians, fearful of losing the funds, employed Mr. J. Hale Sypher to aid them in frustrating the opposition and securing the payment of the appropriation. The appropriation was finally, on June 2, 1893, paid to the Indians, and immediately thereafter Mr. Sypher preferred a claim against the Indians for the sum of $220,000 for having brought ■about the above result. In fact, a bill was introduced in Congress, Sypher having at the time no other jurisdiction or forum to which to appeal for the payment to him of this amount. The bill did not pass. Instead, the claim was referred to this court under section 151 of the Judicial Code. The firm of Mansfield, McMurray & Cornish had been verbally requested to take charge of this matter by the principal chief of the Choctaw Indians. They did appear before ■committees of Congress, and in this court when the case was tried. This court found from the findings returned to Congress that Sypher’s service to the Indians was reasonably worth $5,000. The plaintiff now contends for a fee •of $25,000 for professional sendees rendered in this case.
The petition in the Sypher case was filed in this court April 28, 1904. On this date the firm of Mansfield, McMur-ray & Cornish was under contract to render professional .services to the Choctaw Indians, and whatever may have *506 been the restrictive character of the services to be rendered under this contract, it is manifest from the record that the firm did not present to the Choctaw Nation a fee bill for this particular service, or in any way assert a claim therefor until many years after the case had been closed, and only then in response to counterdemands made upon the part of the nation. It is apparent, a fact we need not emphasize, that the firm was fully cognizant of the statutes which provided the method of contracting with Indian tribes. It knew at the time of its appearance in this case that they could not legitimately collect fees for the service. In all other special cases involving important professional services the plaintiff was solicitous in adjusting its relationship to the Indians in the manner prescribed by law. Just why an oral contract was relied upon in this case finds no explanation, unless predicated upon what has been heretofore adverted to, or due in the last analysis to the counterclaim asserted by the defendants in this case. In addition to this, it is extremely doubtful if we have jurisdiction to entertain the claim. The final proviso to the jurisdictional act of July 19, 1919, amending the act of May 25, 1918, limits the plaintiff to the presentation of only such additional claims as “ may have or shall hereafter be set up by way of set-off or counterclaim by the defendants.” The defendants raise this contention and assert that none of the warrants upon which the counterclaim rests were issued and paid as expenses incident to the prosecution of the Sypher ease. The plaintiff flatly contradicts this statement. The record, in so far as itemization of expense accounts covered by the counterclaim, sustains the defendant’s contention. We are unable to find more in the record than the general statement of the plaintiff, unsupported by any specific account or amount. The burden of proof rests upon the plaintiff, and in this respect we believe the plaintiff has failed to sustain the fact and the defendants’ contention should be sustained.

The EU Ayres Claim,

What has been said as to the J. Hale Sypher claim applies with equal force to this item. The jurisdictional act precludes its allowance.

*507
The Incompetent Fund

In reconciling the record with reference to this item we believe Finding XX to be correct. On June 28, 1898 (80 Stat. 495), Congress appropriated $216,679.48 and placed it to the credit of the Chickasaw Nation in the Federal Treasury. This appropriation was supplemental to a former one made in 1889, amounting to $99,000, and originated in a claim made by the incompetents of sums due this particular class of Indians. After the lapse of nine years and the availability of a substantial sum of money for distribution among the Indians, the usual contest to procure its distribution by certain classes to their advantage arose. The heirs of the incompetents contended that they were entitled to the fund exclusively. The tribe insisted that it should be distributed per capita among the tribe. Congress very wisely settled the controversy by legislation. The act of May 31, 1900 (31 Stat. 221), provided for per capita payments of Indian funds under the direction of the Secretary of the Interior, and this fund for all practical purposes was so disbursed. Happily for the Indians it was not litigated. The plaintiff’s assignors were requested to represent the Indians with respect to the contention and they did so. At the time they were under a general contract of employment to represent the tribe. They received for this service $2,500 in 1901. There is nothing in the record disclosing a further attempt to collect additional fees until after the filing of the defendants’ counterclaim in this case. A claim is now made for $15,000 for this service. The proof fails to sustain it. The proof of an entry of account made contemporaneously with the transaction is cogent evidence of what the plaintiff and his assignors at the time regarded as due them; but it is not sufficient to establish a contract to pay the amount charged in the face of positive evidence to the contrary. The court from the record, and the facts and circumstances surrounding the transaction, believe the amount paid, in view of what is to be held hereafter was sufficient to discharge the Indians’ liability for the service rendered.

*508
Tribal Taxes

Findings XXI. The amendatory jurisdictional act of July 19, 1919, contained the following proviso: “That the said J. F. McMurray shall be limited in presenting such additional claims to such matters as may have or shall hereafter be set up by way of set-off or counterclaim by the defendants.” The intent of this limitation appears upon its face. There is nothing to obscure its meaning or engender doubt. The plaintiff, we repeat, had procured a jurisdictional act covering the prosecution of three, and only three, claims. The Indians presented counterclaims in accord with the statute which, if allowable, would not only absorb all that the plaintiff might recover, but leave him indebted to the Indians in a very large amount. Congress by the amend-atory statute granted the plaintiff the additional privilege to meet the alleged claims plead by way of set-off. To this extent, and to this only, does the right extend. As in the Sypher and Ayres eases, no set-off is preferred with reference to this item, and we are without jurisdiction to consider it.

The Bonaparte Opinion

Finding XXII. This claim is governed by what was said with reference to tribal taxes. No warrants for expenses were issued and paid by the tribes with reference thereto, and it is not a part of defendant’s counterclaim.

Coal-Mining Leases

The defendants assert under this item a counterclaim of a large amount. The original jurisdictional act contains the following provision: “That any amount found to be owing, calculated upon a fair and equitable basis, by the said J. F. McMurray to the said Choctaw and Chickasaw Nations upon coal-mining leases held by him may be offset against any judgment that may be rendered in his favor upon such claims.” The plaintiff is not contending for a judgment in his favor as incident to the coal-mining leases. The determination of the question is limited exclusively to *509 the defendant’s counterclaim and the plaintiff’s affirmative defense thereto.
The act of June 28,1898, 30 Stat. 495, was a comprehensive Congressional conception, intended to ultimately dissolve the tribal existence of the Indians, and eventually put them upon their individual responsibility. The vast landed estate recognized as belonging to the Indians was made up in part of coal lands, regarded at the time as of great value and promising prospects. Congress provided in the statute for the leasing of the lands by mining trustees of the two Nations, who should act under rules and regulations to be prescribed by the Secretary of the Interior. On March 15, 1899, approved by the Secretary of the Interior April 27, 1899, the plaintiff entered into eight mining leases, numbered from one to eight, and embracing in each lease a tract of about 960 acres. The term of each lease was 30 years. The leases provided a dual system of royalties, the plaintiff being obligated to pay as advance royalties $100 the first and second years, $200 the third and fourth years, and $500 per annum for the fifth and each succeeding year. Upon the actual production of coal a royalty of 8 cents a ton was finally fixed by the Secretary of the Interior, the latter to be credited upon the advanced royalties as productions materialized, and reach a point in excess of the annual advanced royalties exacted under the leases. Each lease contained a strict forfeiture clause enabling the Indians to nullify the leases in the event of a failure to pay the royalties within sixty days after they became due and payable. The plaintiff might assign his interest in the leases if the Secretary of the Interior approved the transaction, otherwise not. In 1906 and 1914 the plaintiff did assign, with the approval of the Secretary, his interest in leases four, five, and six, and they are eliminated from this controversy. He attempted to assign lease number eight, but the Secretary declined his approval. The plaintiff met the exacting obligations of the leases by paying the advance royalties due on leases one, two, three, seven, and eight, up to April 27, 1905. Since that time he has paid nothing. If under the jurisdictional act the plaintiff is to respond to the payment of advanced royalties provided in the leases, the defendants *510 are entitled under the counterclaim to a judgment for the amounts stated in the findings.
That Congress was cognizant of the coal-mining leases and the situation of the parties with respect thereto is apparent from the provision of the jurisdictional act directing the court to adjudicate the issue upon a fair and equitable basis. Not only are we to proceed as thus directed, but leases found by the court “ not to be underlaid with merchantable coal and all of said leases upon which royalties are not paid within thirty days after the final settlement of these matters, the same shall be cancelled.” The evidence establishes the fact that the plaintiff has not mined any coal on leases one, two, three, seven, and eight. It further appears beyond the possibility of contradiction that while on large portions of the leases involved there exists an underlying vein of coal sufficient in extent to mine, nevertheless, on account of the depth of the veins, and the inferior quality of the deposit, the expense of operation and the market value of the coal when mined renders the venture prohibitive. We say this advisedly, being confirmed by the fact that notwithstanding the positive right of forfeiture upon the part of the Indians, and in the face of a default in payment of royalties that had existed for over twenty years, neither the Indians nor the Government have ever contemplated taking such action. If a contrary situation prevailed, offering great profits from the lands, it is inconceivable that the parties primarily concerned in realizing gains would stand idly by and content themselves with accumulation of enormous unpaid royalties under circumstances when their ultimate collection was, to say the least, extremely precarious. Within the strict letter of the law the royalties are due. Equitably, with the one exception hereinafter discussed, they are not. Manifestly Congress considered this phase of the matter and was unwilling to hold the plaintiff responsible for the payments exacted under the leases if the same were commercially valueless. The leases should of course be canceled.
While we believe that as to the major portions of the advanced royalties due and unpaid on leases one, two, three, *511 seven, and eight the plaintiff is equitably entitled to relief, there does exist a corresponding equity favorable to the defendants’ contention. Congress in authorizing the leasing of the coal lands stringently inserted provisions in the law designed to prevent mere speculators from securing the lands and to obtain for the Indians a class of earnest and sincere prospectors. We need not classify the plaintiff in this respect. It is sufficient to observe that for some reason he vigorously claimed his rights under the leases, even when notoriously in default as to payments, and at a time when he had every reason to be fully apprised as to their commercial value. Some time prior to June 6, 1910, he was successfully defending in the United States Circuit Court for the Eastern District of Oklahoma a suit by the United States for the use of the Indians (181 Fed. 123) to collect tonnage royalties alleged to be due under his leases; and again on October 24, 1910, in the same court, suffered a judgment to go against him for the sum of $14,288 for overdue advanced royalties. This judgment is still of record and unsatisfied. The plaintiff experienced no difficulty from the record in this case in establishing the nonmerchantable value of the leases. His testimony discloses the expense he had incurred prior to this time in ascertaining their worth. Obviously he may not say he was unfamiliar with his legal rights and ignorant of the hazards involved in the undertaking. As a matter of fact, he was negotiating with the Secretary of the Interior for a settlement of his royalty indebtedness and never once applied in writing for a cancellation of the same. As late as 1918 he was attempting to sell the leases, and there is nothing-in this record to indicate that in 1910 the plaintiff had any intention of releasing his title to the lands demised. Under all these circumstances the defendant Indians had a perfect right to assume that the plaintiff contemplated compliance with the terms of the leases. When suit was brought, judgment recovered pud unpaid, the assumption ceased to exist. From that date rorward the defendants had ample notice that a future continuance of the relationship erected by the leases was fraught with no other result except litigation and controversy, that the recovery of unpaid advance royalties *512 was a remote possibility, and the leases should have been canceled then.
Taking into consideration the mutual equities of the parties, we have no doubt that the amount of this judgment for $14,238, with interest thereon, should be charged against the plaintiff’s claims. It has not been paid and no legal reason assigned for failure to satisfy the same. The sum represents, with substantial exactness, the amount of the advanced royalties due at the time; if not so, proper legal proceedings should have been pursued to correct the error. The amount with interest to date totals $25,668.74.
The facts as set forth in Finding XXVII set up a counterclaim predicated upon a legal right to recover so-called tonnage royalties. The leases themselves contained no covenant to pay tonnage duties based upon minimum production of coal. This alleged liability grows out of a regulation promulgated by the Secretary of the Interior, wherein it is provided that the lessee is to pay a tonnage royalty of eight cents per ton upon a minimum production of 3,000 tons the first year, 4,000 tons the second year, 7,000 tons the third year, 8,000 tons the fourth year, and 15,000 tons the fifth and each succeeding year during the full thirty-year period. The question of the validity of the regulation cited was determined adversely to the contention of the defendant Indians in the case of United, States for use of Choctaw and Chickasaw Nations v. McMurray, 181 Fed. 723. The leases provided in terms what the lessee should pay, and the court held in its opinion that the Secretary was without lawful authority to interpolate covenants contrary to the provisions of the act of Congress fixing the terms of and authorizing the execution of the leases. The defendants in the case accepted this ruling.
The final items of the defendants’ counterclaim are embraced in Findings XXX and XXXI. Defendants’ contention respecting these items is the repetition of an old but persistent conflict of interests which has made its appearance upon more than one occasion, both inside the courts of Oklahoma and the halls of Congress. The pertinent provisions of section 29 of the act of June 28, 1898, 30 Stat. 512, is as follows:
*513 “ It is further agreed that no act, ordinance, or resolution of the council of either the Choctaw or Chickasaw tribes, in any manner affecting the land of the tribe, or the individuals, after allotment, or the moneys or other property of the tribe or citizens thereof (except appropriations for the regular and necessary expenses pf the government of the respective tribes), * * * shall be of any validity until approved by the President of the United States.”
The above findings disclose that during the course of the employment of the firm of Mansfield, McMurray & Cornish as attorneys for the defendant Indians, there was paid to them for services and expenses incurred by both tribes the sum of $89,866.70 under acts of the general council of the two nations which did not receive the approval of the President. The amount is not in dispute. The defendants seek judgment by way of counterclaim for this amount with interest and rest the right upon the single contention that the acts of the general council appropriating the various sums at various times were not approved by the President as the law required. The effect which the defendants ascribe to the exception in the law extends only to the payment of salaries of officials of the nation and incidental expense inseparably attached to governmental administration. The employment of attorneys and payment of expenses connected with controversies between the tribes and outsiders, it is said, is governed by section 2103 of the Revised Statutes, or in any event must be in pursuance of an act of the general council approved as required. The argument is not for the first time preferred in this.case. Its origin may have antedated the year 1904 and doubtless did, but the acute agitation of supposed irregularities and unlawful practices seems to have followed the allowance to the firm of Mansfield, McMurray & Cornish of a fee of $750,000 in December, 1904, by the Citizenship Court, created by the act of July 1, 1902. This event, following a protracted and acrimonious contest for the right of enrollment and participation in the allotment of the Indians’ vast and rich estate, which the attorneys mentioned had most successfully defended, seems to have furnished an occasion for an attack upon the lawyers from almost every angle of their activity. First, agents of the *514 Indian Office were dispatched in 1905 to Oklahoma charged with investigating alleged irregularities in issuance of tribal warrants. Then followed resort to the criminal courts. A grand jury indicted the firm of lawyers and the governors of the two nations. Investigations looking toward a prosecution of the indictments were made by eminent representatives of the Department of Justice, and finally by the Hon. Charles Nagel, of St. Louis, chosen as special investigator, resulting in an express order from the Department of Justice to nolle the same. On November 16, 1907, civil proceedings were instituted in the United States District Court for the Central District of Indian Territory to recover from Mansfield, McMurray & Cornish all sums theretofore paid the firm under the circumstances put in issue in this case by the counterclaim. This case, after remaining for almost two years on the court’s docket, was finally dismissed by the plaintiff, the department conceding inability to recover. On April 24, 1911, Attorney General Wickersham advised the Secretary of the Interior against preferring as a counterclaim the identical sums here involved as a set-off against the plaintiff’s demand for payment of certain other sums claimed as legitimate expenses due. The House of Representatives appointed a special committee to investigate Indians’ contracts on June 25, 1910, and every detail of each transaction relied upon in this case was carefully gone over and full report thereon duly made. Considering the fact that the services of Mansfield, McMurray & Cornish, rendered for the benefit of the Indians, terminated in March, 1907, nineteen years ago, during which period every available resource of the Government and the Indians was employed in a joint effort to attach .illegality to the transaction involved, it seems almost incredible to find the identical contentions again raised in an effort to defeat a claim for attorney’s fees which the defendants concede to be legal and allowable and in opposition to another which the defendants paid in cash while this suit was pending. We refer to the unpaid Chickasaw warrants paid after the institution of this suit and eliminated herefrom. Whatever of doubt existed as to the legality of the payments made in accord with *515 Indian acts not approved by the President seems to have been resolved in favor of the firm of attorneys receiving the same by the governmental agencies clothed with power and authority to investigate, and conducting the investigation at a time substantially contemporaneous with the transactions involved.
If we are correct in our analysis of the jurisdictional acts in attaching significance to the words “any other claim where the services were not actually rendered and finished and resulted to the benefit of said people,” the items covered by this count of the defendants’ counterclaim are not allowable. The record sustains a contention that the services rendered in connection with which the expenses set up as a counterclaim were incurred were completed and resulted in benefit to the Indians. The greater portion of the amounts paid out was disbursed as incidental to the attorneys’ efforts in enforcing the collection of tribal taxes, expelling intruders from Indian country, protecting the tribes in granting rights of way to railroads, town sites, sale of surplus lands, and guarding the Indian rolls, assuredly part and inseparably connected with the regular and necessary administration of the tribal government. In addition to this it is asserted by the plaintiff, and not contradicted by the defendants, that the funds from which the same were paid were accumulated by the tribes as income from the very sources the attorneys were called upon to protect. It is comparatively easy to minimize the importance of services rendered twenty years after the event, and point to a substantial aggregate made up of innumerable items paid out at different dates for a period of eight years as a weighty reason for ascribing illegality and irregularity. The Indian Nations knew what was going on. Government officials were fully cognizant of the attorneys’ activities, and recognized and dealt and cooperated with them during the whole period of time. The Indian officer never once challenged the proceedings during their continuance. As to the sums disbursed under tribal acts, approved by the President, we feel certain they were authorized. The contracts of the law firm as general counsel of the tribes certainly may not be considered *516 onerous or unusual. Congress, by the act of June 28, 1898, the Atoka agreement, clearly intended to exercise its plenary authority over Indian tribal lands and affairs. The statute pointed out the method of procedure, provided the ways and means of accomplishing its purpose, and if followed in this regard, surely what was done thereunder may not now be challenged as illegal and void. Butler & Vale v. United States, 43 C. Cls. 497, 520; Winton v. Amos, 255 U. S. 373.
The counterclaim of the defendants, except as to the one item, the judgment for $14,238, with 6 per cent interest thereon from date of rendition to date of judgment in this case, is dismissed.
Judgment should be rendered in favor of the plaintiff under Finding XIII for $53,900, and under Finding XVII, sections 1 and 2, for $5,277.09, less the sum of $25,668.74 under Finding XXYI, leaving a final judgment in favor of the plaintiff of $33,508.35. As to all other claims the plaintiff’s petition is dismissed. It is so ordered.
GRAham, Judg&; Hat, Judge; and Campbell, Chief Justice, concur.